CITY OF WARSAW and R. Paul
Schmitt, Appellants–
Defendants,

v.

Richard ORBAN and Jan Orban,
Appellees–Plaintiffs.

No. 49A05–0607–CV–404.

Court of Appeals of Indiana.

Dec. 31, 2007.

Transfer Denied May 7, 2008.

Mark D. Ulmschneider, Andrew L. Teel, Steele, Ulmschneider & Malloy, Fort Wayne, IN, Attorneys for Appellants.

James R. Fisher, Debra H. Miller, Miller & Fisher, LLC, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

The City of Warsaw ("City") and R. Paul Schmitt ("Detective Schmitt") appeal following the denial of their motion to correct error, which challenged a judgment in favor of Richard Orban and Jan Orban (collectively "the Orbans") upon a claim for conspiracy to violate civil rights under 42 U.S.C. § 1983 and a claim for conspiracy to criminally convert property. We reverse.

### Issues

The City and Schmitt present multiple issues for review, which we consolidate and restate as the following two dispositive issues:

I. Whether the trial court improperly permitted the jury to determine liability upon the § 1983 claim in contravention of the order of par-

tial remand issued by the United States District Court for the Southern District of Indiana; and

II. Whether the evidence is sufficient to support the judgment against Schmitt for conspiracy to criminally convert property.

### Facts and Procedural History

In 1997, David Melching ("Melching") owned D.A. Melching Construction Company in Warsaw, Indiana and wanted to open a carpet business at the same location. Jan Orban ("Jan") was the construction company bookkeeper, and advised Melching that her husband Richard Orban ("Richard") might be interested in a partnership. Melching and Richard opened Carpet Express in October of 1997, and their partnership agreement was executed on January 2, 1998. Richard acted as the store manager, for a salary of $80,000.00. Jan added Carpet Express to her bookkeeping duties, receiving a salary of $40,000.00. Melching was to receive annual rent of $24,000.00. In 1998, the gross sales of Carpet Express were $1,230,891.00 and the net profit was $22,000.00.

Soon after the partnership was formed, each partner began to suspect or accuse the other of misappropriation of funds, either by taking cash or making unauthorized expenditures with company funds. Jan claimed that Melching pocketed funds from a carpet installation as Melching contended that he was due funds for a cabinet/countertop quote. Melching claimed that employees alerted him that the Orbans were accumulating cash in a suspicious manner.

A break-in occurred at Carpet Express in August of 1998; the burglars were apprehended and found to have little cash.[1]

---

1. Detective Schmitt later interviewed the burglars separately, after they were incarcerated.

However, Richard reported to the investigating officers that several thousand dollars cash from a recent carpet sale was missing from the hiding place where he had secreted it (a telephone book). An insurance claim was made for several thousand dollars.

Melching, his wife, and their attorney went to the Kosciusko County Prosecutor, Charles Waggoner ("Waggoner"), with accusations that the Orbans had been stealing company funds by making cash sales and not reporting those sales. Detective Schmitt, who had been assigned to act as a liaison between the City of Warsaw police department and the prosecutor's office, sat in on the meeting. Detective Schmitt recommended that the Prosecutor request an investigation by an Indiana State Police officer trained to investigate white-collar crime. Trooper Thomas Littlefield ("Trooper Littlefield") was assigned to conduct an investigation.

Trooper Littlefield and Detective Schmitt interviewed Carpet Express employees and subpoenaed bank records. Eventually, Trooper Littlefield signed a probable cause affidavit to obtain a search warrant for records maintained by the Orbans. The search warrant was executed and yielded two computers, for which Jan provided incorrect passwords. The Orbans' attorney advised Detective Schmitt that an accurate password would be forthcoming when the computers were removed from Carpet Express and "secured." (Tr. 941.) At least one computer was allowed to remain at the premises of Carpet Express, for the use of D.A. Melching Construction bookkeeper, Kristie Shepler ("Shepler").

Each burglar independently claimed to have found less than $100.00 at Carpet Express.

On June 25, 1999, the Orbans petitioned for the appointment of a Receiver. When the Receiver took over Carpet Express, he was surprised to find that it was "not a going business" (Tr. 436) but rather was "insolvent" and had "no value." (Tr. 489.) A single creditor, Key Bank, was owed more than the asset value and there was "nothing for general creditors." (Tr. 454.) The Receiver determined that Carpet Express had debt of $238,963.84 plus taxes due. From the sale of assets, Key Bank netted $28,356.84.

Around the time that the search warrant was executed, Detective Schmitt or Waggoner contacted the Indiana Department of Revenue and a Department supervisor assigned criminal investigator Rick Albrecht ("Agent Albrecht") to investigate possible tax evasion. Agent Albrecht was provided with nine banker boxes of Carpet Express documents. Lacking computer access to QuickBooks via password, Shepler and Agent Albrecht downloaded data from a computer onto a disk and sent the disk to Intuit, an information technology services company, so that a new disk could be created and hard copies of Carpet Express records could be printed.

The Orbans were charged with ten felony counts each (nine initiated by Agent Albrecht),[2] and Richard was additionally charged with insurance fraud. They surrendered themselves for arrest, but were never incarcerated. A year and a half later, the charges were dismissed after the trial court granted a motion to suppress. The evidentiary ruling adverse to the State indicated that documents were released from the Orbans' personal files by their accountant without the Orbans' waiver of the privilege afforded under Indiana Code

2. The charges included corrupt business influence, money laundering, perjury, theft, failure to remit sales tax, filing a false income tax return and maintaining two sets of books.

Section 25–2.1–14 *et seq.* *See Orban v. Krull,* 805 N.E.2d 450, 452 (Ind.Ct.App. 2004). Furthermore, the trial court presiding at the suppression hearing found that materials seized pursuant to the search warrant had not been adequately catalogued or secured.

On June 13, 2001, the Orbans brought a § 1983 claim, and also alleged criminal conversion, spoliation of evidence, slander, conspiracy, and abuse of process, naming as defendants the State of Indiana, Indiana Department of Revenue, City of Warsaw, Paul Schmitt (individually), Rick Albrecht (individually), David A. Melching and D.A. Melching & Associates, Inc. The City and Detective Schmitt removed the matter to federal court and the Orbans sought remand to the state court. On October 16, 2001, the United States District Court for the Southern District of Indiana remanded claims against the State and claims arising under state law.

On May 13, 2002, the Marion Superior Court granted the Orbans a default judgment against Melching and D.A. Melching & Associates, Inc. in the amount of $3,275,000.00. The § 1983 claims against the State of Indiana, the Indiana Department of Revenue, and the City of Warsaw were dismissed, as well as the claim for slander against all defendants. Motions for summary judgment filed by the State and by the City of Warsaw and Schmitt were denied; their attempts to pursue an interlocutory appeal were also denied. The City of Warsaw and Detective Schmitt moved for a trial separate from that of the State defendants, which the State opposed. The Orbans joined in the motion to sever. Their memoranda to the trial court stated that their intention was to try all claims against the City of Warsaw and Detective Schmitt in federal court. The motion was denied and a joint trial ensued in the Marion County Superior Court.

At the conclusion of trial, the Orbans moved to dismiss several of their claims. The trial court granted the motion to dismiss various claims, including Conversion, Spoliation of Evidence, Abuse of Process, and Conspiracy to Violate the Orbans' Civil Rights by Prosecuting False Charges (except as to Detective Schmitt and Agent Albrecht), and Conspiracy to Convert Richard Orban's Business Interest (except as to Schmitt). Detective Schmitt moved for dismissal of the § 1983 claim against him because it had been removed to federal court. The motion was denied. The jury was instructed on three claims: the § 1983 deprivation of civil rights claim against Albrecht, the § 1983 deprivation of civil rights claim against Schmitt, and a Conspiracy to Commit Conversion claim against Schmitt and the City.

On June 29, 2006, the jury returned three verdicts, each in favor of the Orbans. The Orbans were awarded $1,575,000.00 against Agent Albrecht on Verdict Form 1 (captioned Violation of Constitutional Rights) and $400,000.00 against Detective Schmitt on Verdict Form 3 (captioned Conspiracy to Convert Assets). On Verdict Form 2 (captioned Conspiracy to Violate Constitutional Rights), the jury "found against" Agent Albrecht and Detective Schmitt but did not specify a dollar amount (as the trial court had specified that the proper procedure was determination of liability for conversion in state court and a forthcoming assessment of damages in federal court). A judgment was entered against Detective Schmitt for $400,000.00 and against the City for $300,000.00 (reduced by statute). Judgment was entered against Agent Albrecht for $1,575,000.00.

The Orbans filed for attorney's fees pursuant to 42 U.S.C. § 1988 and were awarded $681,948.84 against Agent Albrecht

only.[3] The City and Schmitt filed a Motion to Correct Error, which was deemed denied. Detective Schmitt and the City appeal.[4]

### Discussion and Decision

*I. Compliance with Order Remanding § 1983 Claims*

Schmitt contends that the state court jury should not have been permitted to determine his liability for an alleged § 1983 violation in this case. Count I of the Orbans' complaint alleged that the defendants acted with malice and violated § 1983 when they "caused a criminal prosecution to be instituted and to be continued against Richard Orban and Janet Orban without probable cause" and

> knowingly cause[ed] a wholly unwarranted criminal prosecution to be brought, in making knowingly false statements to the Kosciusko County Prosecutor to induce him to file charges, in causing the arrest of Richard Orban and Janet Orban, and in withholding, covering up, and destroying exculpatory evidence ... violated Richard Orban's and Janet Orban's right to be free from unreasonable seizure, in violation of the Fourth Amendment and Fourteenth Amendments to the Constitution of the United States, and right to procedural and substantive due process, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.

(App.75.)

■ The relevant federal statute provides, in pertinent part, that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. Section 1983 provides a civil remedy against a person who, under color of state law, subjects a United States citizen to the deprivation of any rights, privileges, or immunities secured by the federal Constitution or federal laws. *Long v. Durnil,* 697 N.E.2d 100, 105 (Ind.Ct. App.1998), *trans. denied.* In order to recover damages under § 1983, a plaintiff must show that (1) he held a constitutionally protected right, (2) he was deprived of this right, (3) the defendant acted with reckless indifference to cause this deprivation, and (4) the defendant acted under color of state law. *Id.* Section 1983 was designed to prevent the states from violating the Constitution and certain federal statutes and to compensate injured plaintiffs for deprivations of those federal rights. *Culver–Union Twp. Ambulance Serv. v. Steindler,* 629 N.E.2d 1231, 1233 (Ind.1994).

■ Five rules have emerged regarding whether an entity is a "person" within the meaning of § 1983:(1) a municipality, municipal official, local governmental unit or political subdivision may be sued for retrospective (monetary) or prospective (injunctive) relief;[5] (2) a state or state

---

3. Pursuant to 42 U.S.C. § 1988, the "prevailing party" in a § 1983 action may be awarded attorney's fees as part of the costs of the underlying action.

4. Agent Albrecht and the State of Indiana are not active parties to this appeal.

5. Although a municipality may be liable under § 1983 for a deprivation of federal rights, a municipality may not be vicariously liable

agency may not be sued under § 1983 regardless of the type of relief requested; (3) a state official cannot be sued in his official capacity for retrospective relief but can be sued for prospective relief; (4) a state official can be sued in his individual capacity for retrospective relief; and (5) an entity with Eleventh Amendment immunity in federal court is not considered a § 1983 "person" in state court. *Ross v. Indiana State Bd. of Nursing*, 790 N.E.2d 110, 117 (Ind.Ct.App.2003).

■ After removal of the § 1983 claims to federal court, the State of Indiana asserted its Eleventh Amendment privilege.[6] Each state is a sovereign entity in our federal system, and it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

Accordingly, on October 16, 2001, the United States District Court for the Southern District of Indiana issued an order remanding some claims. The remand order provided in pertinent part:

> Plaintiffs' motion to remand is granted in part, to the extent that all federal claims against the State of Indiana and against state officials in their official capacities and all claims arising under state law are hereby REMANDED to the Marion Superior Court. Plaintiffs' claims arising under federal law against defendants City of Warsaw, Schmitt, David A. Melching, and D.A. Melching &

Associates, Inc. remain pending in this court.

(App.82.) The federal court stayed the federal proceedings "subject to the ability of any party to move at any time to lift the stay if circumstances should warrant it or if the party wishes to be heard further." (App.83.)

■ At the outset of trial in the Marion Superior Court, the attorney for the City of Warsaw and Detective Schmitt questioned what would survive in federal court if the Orbans lost the state claim and the trial court responded, "I think it's the 1983 claim." (Tr. 12.) When asked how the federal court would deal with it if the Orbans received a money judgment, the trial court responded, "That's Judge Hamilton's mess." (Tr. 12.) However, after the presentation of the evidence, the trial court denied the motion to dismiss the § 1983 claim against Detective Schmitt. The trial court implemented the procedural plan that the existence of a conspiracy, if any, would be determined by the state court jury and the federal court would subsequently determine what monetary damages were appropriate, if any, for a § 1983 violation.

Allowing the state court jury to determine Detective Schmitt's liability for a "conspiracy" to deprive the Orbans of their civil rights (thereby violating § 1983) is in direct violation of the District Court remand order providing that claims "arising under federal law" against the City of Warsaw and Detective Schmitt remained pending in that court. The substance of

---

under § 1983 for the acts of its employees by application of the doctrine of respondeat superior. *City of Hammond v. Cipich*, 788 N.E.2d 1273, 1281 (Ind.Ct.App.2003), *trans. denied*. Accordingly, a municipality may be liable only if the deprivation is caused by acts that are essentially acts of the municipality itself, such as tortious conduct pursuant to a municipality's "official policy." *Id.*

**6.** The Eleventh Amendment provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI.

the Orbans' claim of "conspiracy to violate § 1983" is such that the claim arises under federal law. A "conspiracy" to violate § 1983 is not a violation of a state statute independent of a § 1983 violation.

■ The state court jury effectively returned an advisory verdict on the pending § 1983 claim in contravention of the District Court remand order. A judicial determination by the federal courts on removal is binding on the state court, as first recognized by our Indiana Supreme Court in *State ex rel. Allis–Chalmers Mfg. Co. v. Boone Circuit Court*, 227 Ind. 327, 86 N.E.2d 74 (1949). Jurisdiction over the § 1983 claim remained with the federal court pursuant to its remand order, thus the trial court erred by entering judgment upon the jury verdict. *See City of Marion v. Howard*, 832 N.E.2d 528, 531 (Ind.Ct. App.2005) (observing that subject matter jurisdiction must exist in order for an entry of judgment to be valid), *trans. denied*. Accordingly, the judgment entered upon the § 1983 verdict against Schmitt is void.

## II. Sufficiency of the Evidence—State Law Claim

■ The Orbans also alleged that Detective Schmitt conspired with Agent Albrecht and Melching to facilitate Melching's taking of Richard's share of some Carpet Express assets. There is no cause of action for conspiracy in Indiana, but there is a cause of action for damages resulting from conspiracy. *Huntington Mortg. Co. v. DeBrota*, 703 N.E.2d 160, 168 (Ind.Ct.App.1998). A civil conspiracy has been defined as "a combination of two or more persons engaging in a concerted action to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means." *Hardy v. South Bend Sash & Door Co.*, 603 N.E.2d 895, 902 (Ind.Ct.App.1992), *trans. denied*. Here, it is alleged that the actors conspired to accomplish an unlawful purpose, the criminal conversion of assets.

In addressing a claim of insufficient evidence, we will not reweigh the evidence nor judge the credibility of witnesses, but will consider only the evidence most favorable to the verdict. *Summit Account and Computer Serv., Inc. v. RJH of Fla., Inc.*, 690 N.E.2d 723, 727 (Ind.Ct.App.1998), *trans. denied*. If substantial evidence of probative value supports the verdict, it will not be set aside. *Id.*

■ The evidence produced by the Orbans in an attempt to demonstrate a conspiracy against them is as follows. Detective Schmitt, who did not know the Orbans, was assigned to conduct an investigation of an alleged theft reported to the Kosciusko County Prosecutor. Detective Schmitt interviewed witnesses identified by Melching as employees having relevant knowledge. He formed the opinion that the Orbans had stolen Carpet Express funds. Detective Schmitt executed a search warrant procured by a State Police investigator. Although it was outside his geographical jurisdiction, Detective Schmitt contemporaneously served upon the Orbans a protective order that had been procured by the Melchings with the assistance of their attorney. Detective Schmitt or Waggoner contacted the Indiana Department of Revenue, and Agent Albrecht was assigned to investigate suspected tax fraud.

Melching gave Agent Albrecht a copy of the Carpet Express annual tax return, signed by Richard, which Agent Albrecht filed without the Orbans' express knowledge. From his review of Carpet Express records, Agent Albrecht identified 113 transactions as "not posted" but was "wrong on 25 or 30 invoices not being included." (Tr. 728, 733.) One of the seized business computers was allowed to remain at Carpet Express, where it was

accessible by Melching or his employees.[7] Jan testified that Carpet Express business records were not adequately "protected" and only 20–25% of their records "ultimately survived the process of being seized." (Tr. 286.) When the protective order was terminated, the Orbans returned to Carpet Express, but found that the lock had been changed and there was a patrol car outside.[8]

Prosecutor Waggoner decided to pursue criminal charges against the Orbans. The Orbans were arrested (although not incarcerated) and were subjected to negative media publicity. A potential employer decided to have no further contact with Richard after she talked to Agent Albrecht. Detective Schmitt communicated with Richard's daughter Dawn concerning the charges and she provided "a lead" which evidently did not come to fruition. (Tr. 1482.) The Orbans postulated that Dawn felt threatened (although she did not testify at trial and Richard testified that he had not known her whereabouts for the preceding three years).

In short, the Orbans adduced evidence arguably tending to show that the investigators were very accommodating to Melching, at times were negligent or unprofessional, and failed to adequately protect the Orbans' interests in seized materials. The Orbans insisted that the investigators believed the wrong business partner and that they were wrongfully accused. At the time of the instant trial, both the expert witnesses and occurrence witnesses conceded that it was impossible to establish which partner, if either, stole Carpet Express funds. All criminal charges against the Orbans had been dismissed. Nevertheless, Prosecutor Waggoner, Detective Schmitt and Agent Albrecht remained convinced of the Orbans' wrongdoing. Assuming that this conclusion is ill-founded and that Detective Schmitt and Agent Albrecht made mistakes that were prejudicial to the Orbans, this does not establish the formation of a conspiracy to assist Melching in criminally converting assets. Indeed, the Orbans' witnesses uniformly testified that they lacked knowledge of a conspiracy.

■ On the face of it, the acts performed by Detective Schmitt appear to be an exercise of his duties within the scope of public employment, for which the Indiana Tort Claims Act provides immunity. *See* Indiana Code § 34–13–3–3(8).[9] This Act expresses a legislative policy to protect the State's finances while ensuring that public employees can exercise their

---

7. Albrecht retained documents printed from the computer. He testified that he customarily conducted a review of printed documents rather than computer files. He also testified that the Indiana Department of Revenue did not employ a certified forensic examiner to examine computer files.

8. The tenor of the direct examination of Jan Orban implied that the Orbans were intimidated by the presence of a patrol car such that they decided to leave the business premises. For example, counsel emphasized the fact that an officer typically carries a gun. However, each of the Orbans testified that they were already leaving when they observed the police vehicle. Jan testified "as we walked back [after deciding to get out of here], I noticed this vehicle" (Tr. 280), and Rick testified that after he and Jan decided to leave, Jan pointed out a police car that he "didn't even notice." (Tr. 946.)

9. This subsection, commonly referred to as the law enforcement immunity provision of the Indiana Tort Claims Act, provides:

A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following: . . .

(8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

independent judgment necessary to carry out their duties without the threat of litigation over decisions made within the scope of their employment. *Noble County v. Rogers*, 745 N.E.2d 194, 197 (Ind.2001). To the extent that acts outside the scope of employment are alleged,[10] the Orbans still bore the burden of establishing that Detective Schmitt conspired with Melching to criminally convert property. Criminal conversion is the knowing or intentional exertion of unauthorized control over property of another person. *See* Ind.Code § 35-43-4-3.

The Orbans did not show that Detective Schmitt, a law enforcement officer of twenty-seven years, or Agent Albrecht, a twenty-six year veteran of the Indiana Department of Revenue, with some improper motivation, planned with Melching to commit an unlawful act against the Orbans. These investigators (who were not previously acquainted with each other, with Melching, or with the Orbans) carried out investigations to which they were assigned by their superiors. While some tasks may have been performed negligently or overzealously, this falls far short of the culpability necessary to constitute assisting criminal conversion.

■ Furthermore, assuming that control of Carpet Express was wrongfully shifted to Melching, evidence of monetary damages was wholly lacking. No formal business valuation was submitted into evidence to establish what value, if any, was taken from partner Richard.[11] Nevertheless, by all testimonial accounts, Carpet Express was undercapitalized and its debt exceeded its assets. The Receiver was unable to conduct an ongoing business. Unsecured creditors received nothing in liquidation and the primary secured creditor received a small portion of what it was due. At best, Melching converted to himself a half-interest in an insolvent business.

The Orbans did not present sufficient evidence to permit the jury to conclude that Detective Schmitt committed conspiracy to criminally convert property.

### Conclusion

The City of Warsaw and Detective Schmitt were entitled to relief upon their motion to correct error, inasmuch as the advisory jury verdict upon the § 1983 claim against Schmitt was in violation of the District Court remand order, and the verdict upon the conspiracy to criminally convert property is not supported by sufficient evidence.

Reversed.

BAKER, C.J., and VAIDIK, J., concur.

### ORDER

On December 31, 2007, the Court handed down its opinion in this appeal marked Memorandum Decision, Not for Publication. The Appellants, by counsel, have filed a Motion to Publish.

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

---

10. Arguably, the Orbans alleged that Detective Schmitt performed an act outside the scope of his employment when he served the protective order outside his jurisdiction. Detective Schmitt could not specifically recall whether or not the trial court that issued the search warrant and protective order asked him to serve the protective order along with the search warrant.

11. In contesting the Motion to Correct Error, the Orbans claimed that the admission into evidence of their default judgment against Melching somehow established a business value for purposes of the instant litigation. However, the Orbans did not seek admission of the default judgment document on this basis, and the parties entered into no such stipulation. The Receiver and Melching testified that the business was insolvent and the Orbans offered no contradictory evidence.

1. The Appellants' Motion to Publish is GRANTED and this Court's opinion heretofore handed down in this cause on December 31, 2007, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

BAKER, C.J., and VAIDIK, J., concur.